# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CR 10-01031(A)-AHM | Date | December 1, 2011 |

Present: The Honorable  **A. HOWARD MATZ**

Interpreter

| Stephen Montes | Not Reported | Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|

USA v. ENRIQUE FAUSTINO AGUILAR
NORIEGA, et al.

**Proceedings:** IN CHAMBERS (No Proceedings Held)

## ORDER GRANTING MOTION TO DISMISS

## I.
## INTRODUCTION

In this case, the first Foreign Corrupt Practices Act criminal prosecution against a corporation to proceed to jury trial, the Court has been asked to vacate the convictions and dismiss the indictment because of alleged prosecutorial misconduct. On November 29, 2011, the Court conducted a hearing on this motion. Before the hearing began, the Court provided a draft of this order to all the lawyers and allowed them three hours to prepare for argument. The hearing lasted for more than two and a half hours.

When faced with motions that allege governmental misconduct, most district judges are reluctant to find that the prosecutors' actions were flagrant, willful or in bad faith.[1] In this case, for example, the Court denied several previous motions to dismiss and permitted the prosecution to proceed over the heated objections of defense counsel because it was willing to

---

[1] For an example of a court's reluctance to make those findings, see *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008). There, the apparently ambivalent district judge stated that "the government did not act intentionally" but also said that the government "did not . . . act [ ] . . . unintentionally." The appellate court characterized this ruling as "somewhat confusing." *Id.* at 1080 n.2.

accept the prosecutors' assurances that their conduct was inadvertent and would not be repeated. The Court even said it was "not anxious to attribute a deliberate, intentional, and devious motive" to the Government. April 5, 2011, R.T. at 448.

In this Court's experience, almost all of the prosecutors in the Office of the United States Attorney for this district consistently display admirable professionalism, integrity and fairness.[2] So it is with deep regret that this Court is compelled to find that the Government team allowed a key FBI agent to testify untruthfully before the grand jury, inserted material falsehoods into affidavits submitted to magistrate judges in support of applications for search warrants and seizure warrants, improperly reviewed e-mail communications between one Defendant and her lawyer, recklessly failed to comply with its discovery obligations, posed questions to certain witnesses in violation of the Court's rulings, engaged in questionable behavior during closing argument and even made misrepresentations to the Court.

Consequently, the Court throws out the convictions of Defendants Lindsey Manufacturing Company, Keith E. Lindsey and Steve K. Lee and dismisses the First Superseding Indictment.

# II.
# BACKGROUND

On October 21, 2010, the Government filed a First Superseding Indictment ("FSI") charging Defendants Keith E. Lindsey, Steve K. Lee, and Lindsey Manufacturing Company ("the Lindsey Defendants") with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), as well as substantive violations of the FCPA. Lindsey Manufacturing Company ("LMC") is a relatively small, privately-owned company that manufactures emergency restoration systems and other equipment used by electrical utility companies. Keith Lindsey is its President and CEO. Lee is LMC's Vice-President and CFO.

The gist of the allegations in the FSI was that the Lindsey Defendants paid bribes to two high-ranking employees of the Comisión Federal de Electricidad ("CFE"), an electric utility company wholly-owned by the Mexican Government. LMC funneled the alleged bribes to the CFE employees (Nestor Moreno and Arturo Hernandez) by making payments to Grupo International ("Grupo"), a company owned and controlled by co-Defendants Enrique Faustino Aguilar Noriega ("Enrique Aguilar") and his wife, Angela Maria Gomez Aguilar ("Angela

---

[2] Two of the three members of the prosecution team in this case were from the Washington, D.C., main office of the Department of Justice ("DOJ"), including the lawyer who initiated the investigation. Only one "local" AUSA was involved.

Aguilar").[3]  The payments from LMC to Grupo ostensibly were commissions for services performed by Enrique Aguilar in his capacity as LMC's sales representative in Mexico. In reality, according to the indictment and to the Government in its trial presentation, large portions of those payments were used to bribe Messrs. Moreno and Hernandez.  The alleged bribes consisted primarily of the purchase of an expensive Ferrari and a fancy yacht for Moreno, payment of his American Express bills, and a number of other payments benefitting Hernandez and him.

The investigation and ensuing charges in this case resulted directly from an earlier investigation and several prosecutions in the Southern District of Texas.  *See United States v. ABB Inc.*, No. 10-CR-664 (S.D. Tex.), *United States v. ABB Ltd.-Jordan*, No. 10-CR-665 (S.D. Tex.), and *United States v. O'Shea*,
No. 09 CR-629 (S.D. Tex.).  In those cases the Government alleged that the ABB entities and an ABB employee paid bribes to CFE officials through a Mexican middleman named Fernando Maya Basurto and his father.  The Government's lead prosecutor in those cases was one of the Department of Justice prosecutors at this trial, and sometime in 2008 she initiated the investigation that led to the charges here.[4]

The defendants in the ABB cases allegedly used an Enrique Aguilar-controlled entity named "Sorvill" to funnel at least some of those bribe payments to the CFE officials.  As will be shown below, the prosecutors in this case pushed aggressively to link Sorvill to the Lindsey Defendants, when in fact there was no evidence even suggesting the Lindsey Defendants ever heard of Sorvill.

In late December 2009 the Government obtained a sealed warrant for the arrest of Enrique Aguilar, a Mexican national.  He has never been arrested and was not present at trial. But on August 9, 2010, his wife Angela Aguilar ("Angela") *was* arrested, pursuant to a warrant, while she was engaged in business in Texas.  That day, a complaint containing criminal

---

[3] The Aguilars were the only Defendants named in the original indictment.  In the First Superseding Indictment, Enrique Aguilar was charged with conspiracy to violate the FCPA, substantive FCPA violations, conspiracy to commit money laundering, and substantive money laundering violations. Angela Aguilar was charged with conspiracy to commit money laundering and substantive money laundering violations.

[4] The other DOJ lawyer did not begin to work on this case until considerably after the First Superseding Indictment was returned.  He was not involved in the ABB cases or in the grand jury proceedings and the non-production of grand jury transcripts that are discussed below.

charges was filed against her in this district.  (Dkt. 13.)  According to Angela's initial attorney, not long thereafter the DOJ attorney responsible for the ABB cases "indicated" to him that the Government might enter into a pre-indictment diversion agreement with Angela if she cooperated in arranging for her husband to surrender to U.S. authorities.  Zweiback Decl. ¶ 2. (Dkt. 232.)  Angela refused.

Angela was brought into this jurisdiction on August 30, 2010.  (Dkt. 8.)  The Government then had to move quickly to obtain an indictment.  The original indictment, naming just Angela and her husband as Defendants, was filed on September 15, 2010.  Enrique was accused in four counts of violating the Foreign Corrupt Practices Act, in a fifth count of conspiracy to do the same, in a sixth count of conspiring to launder money and in a seventh count of money laundering.  Angela was named only in the sixth and seventh counts relating to money laundering.

Having indicted the Aguilars, having reason to know that Angela was intent on proceeding quickly to trial, and knowing that if she were tried alone the Lindsey Defendants would have a "free look" at what they would face in any subsequent trial against them, the prosecution again moved quickly to secure charges against those Defendants.  It presented some evidence to one grand jury on September 8, 2010, and September 15, 2010.  It then convened a second grand jury and presented evidence to it on October 14, 2010, and October 21, 2010.

The First Superseding Indictment adding the Lindsey parties as Defendants was filed on October 21, 2010.  Thereafter, and continuing through the course of the trial, this case proceeded at an unusually rapid pace, in part because the Defendants were intent on exercising their rights under the Speedy Trial Act.  The jury trial began on March 30, 2011.

The case not only moved quickly, but it also led to an extraordinary number of motions, *ex parte* applications, requests for judicial notice, disputes over jury instructions and other disputes necessitating dozens of hearings before and during the trial.  For example, in a single ominous pleading, the Government filed twelve motions: four to admit various items of evidence, including evidence relating to the ABB cases, six to preclude Defendants from introducing certain evidence and two other motions.  (Dkt. 225.)  For their part, before the motion to dismiss now before the Court was first filed on May 9, 2011, the Defendants (including Angela Aguilar) collectively filed eight previous motions to dismiss the indictment, at least five of which were based on claims of governmental misconduct.[5]  Defendants also filed

---

[5] One of this Court's rulings denying such a motion is *United States v. Aguilar*, 783 F.Supp.2d 1108 (C.D. Cal. 2011).

more than two dozen other motions and *ex parte* applications.

The fast pace of pre-trial preparation and the almost non-stop, often acrimonious motion practice that took place from October 2010 through the return of the verdicts on May 10, 2011, is important for at least two reasons. First, it meant that each side forced the other to divert resources away from trial preparation. Although that undoubtedly handicapped each side to some extent, the Defendants were hurt more. While furiously preparing for trial they also had to seek to discover information about the investigation and the evidence supporting the charges. Yet, as is demonstrated below, they were often thwarted. In contrast, the Government had been investigating the case since 2008. On the Government's trial team were three experienced prosecutors, some paralegals, and a large number of FBI agents. Once an indictment has been returned, the Government is presumed to be ready to proceed to trial, even if, as was apparently the case here, the Government was compelled to indict some Defendants (the Lindsey Defendants) sooner than it would have preferred because it already had indicted some other Defendants (the Aguilars).

Second, when a trial judge managing a large docket is required to devote a great deal of time and effort to a fast-moving case that requires numerous rulings, often the judge will miss the proverbial forest for the trees. That is what occurred here. This Court was confronted with so many motions challenging the Government's conduct that it was difficult to step back and look into whether what was going on reflected not isolated acts but a pattern of invidious conduct. Although the Court did issue orders granting various of Defendants' motions to suppress, motions to exclude evidence, motions to compel further discovery, motions for curative instructions, etc., it did not fully comprehend how the various pieces fit together. And fit together they do. The Government has acknowledged making many "mistakes," as it characterizes them. "Many" indeed. So many in fact, and so varied, and occurring over so lengthy a period (between 2008 and 2011) that they add up to an unusual and extreme picture of a prosecution gone badly awry. To paraphrase what former Senator Everett Dirksen supposedly said, "a few mistakes here and a few mistakes there and pretty soon you're talking misconduct."

In any event, the flurry of activity did quickly reveal one key feature of the case, however: the Lindsey Defendants never had anything to do with Angela Aguilar. They never met her or communicated in any way with her. Nor did any LMC representatives. So at trial what would and did certainly prove critical as to the Lindsey Defendants was whether their dealings with Enrique Aguilar showed a knowing intent on their part to use him to bribe CFE officials.

In any event, after the case proceeded to trial on April 4, 2011, the Government put some 23 witnesses on the stand. A little more than five weeks later, on May 10, 2011, the jury

returned guilty verdicts against all the Defendants who went to trial on all counts.[6]


    The key evidence against the Lindsey Defendants is fairly shown in the following summary, which is based on the prosecution's closing argument:

• In 1999 LMC was deprived of a sale to CFE it had won at a public tender in Hermosillo, Mexico, because of the machinations of a competitor ("SBB") that was represented by Enrique Aguilar. Sergio Cortez, a key LMC employee, told both Lindsey and Lee that the contract in question had been cancelled because of the relationship between Aguilar and CFE official Nestor Moreno.

• At some point LMC decided to hire Aguilar as its representative.

• A former colleague of Aguilar's named Jean-Guy Lamarche told Lee that Aguilar was corrupt and was being investigated in Mexico. Nevertheless, LMC continued with its plans to hire Aguilar as its sales rep in Mexico.

• Before Aguilar was actually hired, Lee told an LMC employee (Zavaleta) something to the effect that maybe the advantage SBB had was that it was bribing CFE.

• In mid-January 2002 LMC, under the direction of Lindsey and Lee and through the auspices of Zavaleta and the then-existing LMC representative in Mexico, drafted a complaint ("inconformidad") addressed to Arturo Hernandez, who was Moreno's superior. (In the indictment Hernandez is referred to as one of the foreign officials who were paid a bribe.) In essence, the complaint grew out of the incident at the 1999 Hermosillo public tender that, according to LMC, revealed that Aguilar was displaying undue influence. The document urged that behind-the-scenes machinations not occur again. Zavaleta attempted to give the complaint to Hernandez but was unsuccessful. After he returned to Southern California, LMC toned down the complaint and arranged to have it sent to Hernandez. Thereafter, in around February 2002, Hernandez met with Cortez and Zavaleta. Hernandez acknowledged no wrongdoing and took no action to

---

[6] The Court had granted a Rule 29 motion on the money laundering count against Angela Aguilar. Several weeks after the verdict was returned she and the Government agreed to seek a "time served" sentence in return for her not appealing and being subject to supervised release. The Court accepted that sentence, which was pronounced on June 3, 2011. (Dkt. 597.) Aguilar soon thereafter returned to Mexico.

address or redress LMC's complaint. Zavaleta returned to LMC with the view that the meeting had gone badly. A few days later, Lindsey wrote a letter to Hernandez repudiating the letter that Zavaleta had presented to him. At some point thereafter LMC fired Zavaleta.

• Sometime in around May 2002 - - some three years after the 1999 Hermosillo transaction described in the first bullet point - - LMC finally hired Aguilar.

• The 30% commission that LMC agreed to pay Enrique Aguilar was way over the industry norm and higher than the commissions LMC had paid to its prior Mexican sales representatives. As the prosecutor put it in his closing argument, "How could they not know that Enrique was corrupt when they hired him? How could they not know that the 30% was designed to get money to the foreign officials?" May 6, 2011, R.T. at 4150.

• Defendant Steve Lee originally recorded the commission expense of 30 percent, but because he knew that was a big flag of corruption, he directed his underling, Mindy Kwok, to change the classification to 15 percent commission and 15 percent outside services.

• LMC's payments to Enrique Aguilar were made to his company, Grupo.

• From Grupo's account, funds were withdrawn that Aguilar used to pay for the Ferrari, the yacht and the Amex payments.

That pretty much was the gist of the Government's case against the Lindsey Defendants. The trial was as lengthy as it was because at least half of the Government's efforts was devoted to trying to prove that Angela Aguilar was in cahoots with her husband.

On May 9, 2011, just before the jury began its deliberations, the Lindsey Defendants filed another motion to dismiss based on governmental misconduct. The Government filed opposition papers after the jury returned its verdicts, the defense filed a reply brief, and the Court began to hold a hearing on June 27, 2011. Shortly before the Court entered the courtroom that day, it was informed that the Government had just filed a "Notice of Grand Jury Testimony" (Dkt. 616) in which the Government disclosed for the first time that it had violated certain orders of this Court by not previously producing the transcript of F.B.I. Special Agent Susan Guernsey's grand jury testimony at a session held on October 14, 2010. The Court asked the prosecution to explain.

Apologizing profusely, the AUSA, who previously had told the Court that the

Government had produced all the transcripts, stated that it was an unintentional oversight. The Court, relying in part on a handwritten list it had compiled during the trial and kept privately at the bench, responded by reciting many examples of

> things that [during the course of the trial] I found troubling, that sometimes were the subject of requests or rulings - - and by no means is this inclusive - - that suggests to me that the at best extraordinarily sloppy investigation and prosecution of this case - - at best - - needs to be assessed fully in order to determine whether the defendants' rights were violated.[7]

Instead of proceeding with the hearing on the then-pending motion to dismiss, the Court ordered that supplemental briefs be filed. Later, the Court allowed the parties to exceed the required page limits. Altogether, the Court received and reviewed 115 pages of legal argument from Defendants and 80 pages from the Government. This does not include reams of exhibits that the lawyers filed.

### III.
### MISCONDUCT FINDINGS

Based on the facts set forth below, the Court finds the following conduct on the part of the Government violated the Lindsey Defendants' rights.

### A.    PRE-INDICTMENT MISCONDUCT

#### 1.  Falsehoods in Search Warrant and Seizure Warrant Affidavits

On November 14, 2008, FBI Special Agent (and Co-Case Agent) Farrell Binder executed an affidavit in support of a request for the issuance of a search warrant for the LMC business premises. Trial Ex. 2538. In it appeared the following language: "Sorvill, one of the intermediaries that received payments from ABB Sugarland, also received payments from Lindsey [Manufacturing] . . . ." There was a second statement in Binder's affidavit to the same effect. As noted above, Sorvill was a company controlled by Enrique Aguilar. These statements were false. LMC never paid money to Sorvill.

The Defendants repeatedly pressed for disclosure of all drafts of the Binder affidavit,

---

[7] Some examples of the "troubling" conduct are addressed in this order.

beginning as early as November 22, 2010.  The Government repeatedly refused to produce them, continually denying that they fell within the Government's *Brady* obligations.  *See Brady v. Maryland*, 373 U.S. 83 (1965).

The Court conducted a *Franks* hearing on March 23, 2011.  *See Franks v. Delaware*, 438 U.S. 154 (1978).  Binder testified.  In response to questions the Court posed, she disclosed that it was one of the prosecutors who inserted the false representations about "payments from LMC to Sorvill" into what became her executed affidavit, without consulting her.   The Court nevertheless stated that it would probably deny the *Franks* motion because probable cause had been demonstrated, notwithstanding the misrepresentations about Sorvill.[8]   The Government then disclosed - - for the first time - - that the Binder affidavit was additionally misleading, because it failed to disclose to the magistrate judge that in around January of 2007 some $433,000 had been deposited into the Grupo account from funds provided by someone other than LMC.[9]  The Government lawyers stated that they had discovered this error while preparing their response to the *Franks* motion.  The Court thereupon ordered that all the drafts of Binder's affidavit be turned over to Defendants, promptly.

Sometime thereafter, Defendant Steve Lee's attorney reviewed the drafts of the Binder affidavit.  According to her declaration in support of this motion, Binder's affidavit went through 14 drafts.  The first 12 drafts did not contain the false claim that LMC had

made "several large payments to Sorvill."  The Government has not refuted her declaration.

Before the hearing on this motion the Government never identified the prosecutor who had inserted the false statement into the Binder affidavit.  Nor had it explained why that individual never informed Binder that the misstatement had been inserted into her

---

[8]     That is what the Court eventually did.  Now, in opposing dismissal the prosecution asks the Court to disregard the false statements in Binder's affidavits because of the prior denial of the *Franks* motion.  The issue at this point is different, however:  it is not whether there was sufficient, non-tainted cause to obtain a warrant, but whether the Government's submission to a magistrate judge of an affidavit containing a material falsehood was part of an overall course of conduct that requires the sanction of dismissal.

[9]  This amount was far more than the $297,000 taken from the Grupo account to pay for Nestor Moreno's Ferrari.

affidavit.[10]  As to why the prosecution refused to produce to Defendants the 12, non-misleading drafts until after the Court ordered it to do so at the *Franks* hearing, the Government merely asserted, "Aside from *Brady*, [Defendants] cite no authority in support of [the] proposition" that the Government had a duty to turn over that information. Government's Resp., n.8, pp. 10-11.  Whether the Government's refusal to produce the drafts voluntarily was part of an effort to conceal wrongful conduct and *Brady* material is discussed below.

In any event, it turns out that the untruthful language in the November 14, 2008, Binder affidavit about the non-existent payments to Sorvill was also contained in at least five other, later-executed affidavits submitted to federal judges in support of search warrants or seizure warrants.  The untrue statement was in a "follow on" warrant on November 20, 2008; in the December 1, 2008, Bluffview seizure warrant affidavit; in the August 27, 2010, and October 5, 2010, Dream Seeker Yacht seizure warrant applications; and in the October 5, 2010, Banco Popular Account seizure application.  Binder signed three of these affidavits and FBI Special Agents Susan Guernsey and Rodolfo Mendoza one each.

## 2.  ESI Language in Search Warrants

As the Court previously found, in searching and reviewing the electronically stored information ("ESI") found on the seized LMC computers, the FBI failed to comply with *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982).  The language in the search warrant authorized the case agents, not merely computer personnel comprising a "filter" team, to review the contents.  However, this Court previously found that this error was the product of clumsy drafting, not bad faith.  Although the Court still finds that this violation was not invidious, the Defendants' post-trial briefs demonstrate that the improper language authorizing review by case agents was not present in 11 of the 14 versions of the warrant, thereby permitting the inference that the Government purposely inserted it in the final version.

## 3.  Unauthorized Warrantless Search

Having obtained a search warrant for the LMC premises based in part on the

---

[10] At the hearing the AUSA accepted the responsibility and attributed his insertion of the false statement to a misunderstanding.  He stated that he asked the affiant to point out any errors in his changes to the draft and that she did not inform him of this material misstatement.

material falsehood in the Binder affidavit, some FBI agents compounded the search warrant error by searching two LMC buildings (buildings 6 and 7) that were not mentioned in the initial affidavit or authorized by the initial warrant. The Government responded to Defendants' subsequent motion to suppress by stating that it had obtained consent and had in any event found no evidence in these searches.

### 4. <u>Grand Jury Testimony of Susan Guernsey</u>

(a) FBI Special Agent (and Co-Case Agent) Susan Guernsey ("Guernsey") testified before the grand jury on four occasions. In her first and third appearances, on September 8, 2010, and October 14, 2010, the prosecution displayed to the grand jurors a chart connecting LMC and ABB to both Sorvill and Grupo, in an unbroken single line. Ex. B to Defendants' Reply papers. (Dkt. 652.) To thereby suggest a non-existent link between LMC and Sorvill was similar to the unfounded statement about Sorvill in Binder's affidavit.

(b) In the September 8, 2010, session of the grand jury, Guernsey stated that a July 3, 2006, contract between LMC and Aguilar's company Grupo was created "in response, actually to a [sic] IRS audit of Lindsey Manufacturing's accounting practices with regards to their tax returns and they were questioned as to the 30 percent commission." G.J. at 80. In fact, LMC had no notice of any audit when that contract was executed, and the IRS audit that LMC did learn about later on did not relate to tax year 2006 or to commissions.

(c) In early 2010, in response to a grand jury subpoena, LMC produced records to the Government showing that before engaging Enrique Aguilar as its sales representative, LMC had entered into approximately nine or ten contracts with CFE, with a total value of some $8 million. These documents were produced directly to Agent Guernsey. Nevertheless, in the October 21, 2010 grand jury session, a grand juror asked whether Lindsey had a history of winning contracts from CFE. Guernsey replied that Keith Lindsey had said that the first contract "was in '94" but then she testified that "they [LMC] didn't have a lot of business with CFE before they hired Aguilar." G.J. 10/21/10 at 67. At trial Agent Guernsey attempted to explain her grand jury testimony by stating that she was aware of only two contracts between LMC and CFE before Enrique Aguilar was hired. She claimed to have been unaware of five additional specified contracts, partly because they were written in Spanish. Many of the other materials LMC produced in response to the grand jury subpoena were in Spanish, however, and in any event, the five contracts had been translated into English.

(d) On October 21, 2010, Guernsey also told the grand jury that on the day in

November 2008 when the search warrants were executed at the LMC premises, Steve Lee was questioned by the FBI about what the 30-percent commission was going to be used for. Guernsey swore that Lee replied that he "[d]idn't want to know. Just didn't want to know." G.J. 10/21/10 at 22. Guernsey was not present at the interview of Steve Lee. The FBI's "302" memorandum of that Lee interview contains no such statement, and the Government acknowledges that he never said that.

(e)  Guernsey also told the grand jury that in response to an IRS audit, LMC (through Defendant Steve Lee) told Mindy Kwok, the LMC bookkeeper, "'We need to reclassify the commission. We need to split 15 and 15 - - 15 to commission and 15 to other services' . . . [And] once she [the bookkeeper] reclassified them, [all those documents] were turned over to their accountant for the IRS audit." G.J. 10/21/10 at 30-31. In fact, the conversation between Lee and the bookkeeper was not in response to any IRS audit. Nor did Lee instruct the bookkeeper to reclassify previous payments and entries. Nor were any payments in fact reclassified, other than the single one the bookkeeper had testified about.

(f)  Toward the end of Agent Guernsey's final grand jury appearance on October 21, 2010, a grand juror asked her to confirm that in the Grupo account "there were essentially no other funds . . . other than those that came from [LMC]." Having previously told the grand jurors that "[m]ost of [the funds] came from Lindsey. Pretty much all . . . ," Guernsey replied: "I said the majority of the funds from Grupo. I would say as high as 90, 95 percent of the funds in the Grupo account are from Lindsey, yes." G.J. 10/21/10 at 69, 75. Yet in an earlier affidavit Guernsey previously had stated, accurately, that the Lindsey deposits in the Grupo account "constitute [only] approximately 70% of all . . . deposit[s] into the . . . account during this period." Trial Ex. 2533. That there is a material difference between these sworn statements is something even FBI Special Agent Dane Costley acknowledged at trial.

The false or misleading testimony in items (c) - (f) was given on October 21, 2010, the day the First Superseding Indictment was returned by the grand jury. Each such portion of Guernsey's testimony that day was indisputably material, as was clearly reflected in the Government's theories of the case presented to the grand jury and at trial, as well as the fact that some of the testimony was given in response to grand jurors' questions. Thus, the Government emphasized that LMC fired its previous agent and hired Enrique Aguilar to get contracts from CFE it had not been previously awarded; it argued that Lee possessed the requisite knowledge because he purposely turned away from the truth of Aguilar's corrupt ties to CFE officials (see below); it stressed that the 30% commission referred to in some of the LMC-Aguilar contracts was inflated and in fact was an attempt to disguise that at least half of those monies would be used to bribe CFE

officials; it suggested that LMC was also in the trouble with the IRS; and it relied on a strained theory of tracing of funds to show that the payments from Grupo for the benefit of the CFE employees who were the bribe recipients (Moreno and Hernandez) came from LMC funds.[11]

The Court has not addressed certain other portions of Guernsey's grand jury testimony that the Defendants characterize as false. The Court does not consider those statements to be significant. Indeed, some are innocuous and others ambiguous, but not clearly false or misleading. However, Defendants also contend that Guernsey's grand jury testimony was wrongful because of what she did *not* say - - *i.e.*, because of what Defendants describe as an effort to conceal important and exculpatory information. Included among these omissions are that Hurricane Wilma hit Mexico in July 2006, causing immense damage that required the CFE to procure and install emergency restoration systems immediately, and soon thereafter the first significant post-Aguilar contract between LMC and CFE was signed; that the IRS audit found no irregularities in LMC's payments to Grupo and no taxes owing; and that $433,000 had been deposited into the Grupo account from a source other than LMC.[12]

## B.     POST-INDICTMENT MISCONDUCT

### 1.  <u>Failure</u> <u>to</u> <u>Produce</u> <u>Guernsey</u> <u>Grand</u> <u>Jury</u> <u>Testimony</u>

The foregoing summary of the unfounded and erroneous portions of the grand jury testimony of FBI Co-Case Agent Guernsey does not necessarily establish that she knowingly committed perjury. Perhaps she was sloppy, or lazy, or ill-prepared by the

---

[11] The theory was strained because for the most part it failed to show a temporal link between when Grupo received funds from LMC and when Grupo made payments for the benefit of Moreno and Hernandez. *See* fn.21, *infra*.

[12] In response, the Government points out that it had no legal obligation to present exculpatory evidence to the grand jury and that an indictment may not properly be dismissed merely because of its failure to do so. *See United States v. Williams*, 504 U.S. 36, 53-54 (1992). Viewed in a vacuum, the Government's response is correct. On this motion the omissions are not irrelevant, however, because the standard the Court must apply on this motion is whether, in its totality the Government's conduct was so improper and harmful to the Defendants as to have violated their rights, undermined the very foundations of judicial integrity, or otherwise been so egregious as to require a deterrent sanction. *See United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) and fn.20 below.

prosecutive team.  In any event, in the Court's considered opinion, once the prosecutors secured the First Superseding Indictment and certainly by the time they were gearing up to present their case at trial, they concluded not only that Guernsey would be an exceedingly poor witness - - as she turned out to be - - but also that its investigation was terribly flawed.  Indeed, outside the presence of the jury, the Government acknowledged in open court that, as the Court put it, the prosecutors "didn't want someone who was part of the investigation [to testify], so there wouldn't be questions about the investigation."  April 15, 2011, R.T. at 1698.   So the prosecutive team decided to keep Guernsey far away from the witness stand - - indeed, from the courtroom.  Neither she nor her Co-Case Agent Binder was permitted to sit at the prosecution table, a most unusual and telling sign that something was seriously remiss in the Government's case.

Under standard principles of discovery and under the well-established *Jencks* doctrine, if Guernsey would not testify at trial, the Defendants would have no right to obtain the transcripts of her grand jury testimony unless they contained *Brady* material. Nevertheless, defense counsel tried to obtain the transcripts.  On January 3, 2011, the prosecutors informed the Defendants' lawyers for the first time that Guernsey had been the summary witness at the October 21, 2010, grand jury session that resulted in the return of the First Superseding Indictment.  Defense counsel immediately requested her testimony. The prosecutors refused.  One defense attorney has asserted in a declaration that one of the DOJ attorneys actually stated that the reason Agent Guernsey would not be called at trial was "because she had testified before the grand jury."  The prosecutors have not denied that one of them made that peculiar statement.

In any event, for the critical first five months or so of trial preparation the Defendants had no access to any portion of Guernsey's grand jury testimony.  On March 21, 2011, the Court ordered that Agent Guernsey be present for an upcoming hearing on Defendant Keith Lindsey's then-pending motion to suppress a statement he supposedly had given to the FBI on the day the LMC premises were searched.[13]  Thereafter, LMC's attorney again requested the transcripts.  The day before the suppression hearing, he was given nine pages (out of 67) from the transcript of just one of the four sessions at which Guernsey testified - - the concluding session on October 21, 2010.  Those few pages were heavily redacted.

After Binder testified at the suppression hearing, the Defendants moved for

---

[13] Lindsey claimed that he had not been given a proper *Miranda* warning and had not voluntarily given the statement.  The Court agreed and suppressed it.

production of all the transcripts of her grand jury testimony.  Instead of granting the motion at that point, the Court ordered that all the transcripts be filed under seal for *in camera* inspection by the Court.  After conducting that inspection, and in light of the several major problems that had surfaced in the suppression hearing testimony, the Court ordered that all the transcripts be produced to the Defendants in their entirety.

The jury was empaneled on March 30, 2011.  Opening statements began on April 5, 2011.  The transcripts were produced, finally, on April 15, 2011, more than ten days after the openings.  Or so the Court and Defendants believed, based on the Government's representations.  Not so, as it turned out.  For as noted above, some seven weeks after the verdicts were returned, the Government disclosed that it had not turned over the transcript of Guernsey's October 14, 2010, grand jury testimony.

The prosecution attempts to excuse or minimize many of its discovery violations, characterizing them as inadvertent mistakes, as the Court noted above.  It also complains that the Defendants mischaracterize various remarks the Court made as "warnings" about its discovery practices.  Supp. Opp. at pp. 63-64.  First, and in any event, federal prosecutors are not entitled to warnings from the court and should not require them; they must comply with *Brady, Jencks*, and Rule 16, regardless of court admonitions. Moreover, the record reflects that the Court *did* warn the prosecution about its discovery and other obligations, on numerous occasions.  Thus, on December 14, 2010, during a hearing on Defendants' motion for a bill of particulars, the AUSA assured the Court he had turned over all required evidence.  In response, the Court stated that it was "not accusing the AUSA of any misconduct," and it did not think he was "in the process of committing it," but was merely giving him "fair warning." December 14, 2010, R.T. at 42.

Similarly, on March 30, 2011, the Court cautioned the AUSA that it was counting on him to be aware of and carry out his duty to produce *Jencks* and other discovery.  The AUSA responded that all *Jencks* statements the prosecutors were aware of had been produced.

On April 5, 2011, the Court again emphasized that both sides had to comply with discovery obligations and complained "about late-coming, incomplete, supposedly inconsistent disclosures" on the part of the Government.  Nevertheless, on the very next day, the Court was informed that an upcoming trial witness (Zavaleta) had met with the AUSA and Agent Binder on two undisclosed occasions for which there were no 302s. (The Government characterizes these discussions as "witness preparations" for which there was no need or duty to prepare a 302.)  This time the Court went into greater detail in admonishing the AUSA.

The interruptions in this case and before the trial began that have
to do with the Government's flow of information are extremely
troubling.

Now, I understand you have two paralegals here and I'm not at
all attributing any omissions or errors or confusions to them, but I am
instructing you, as the person I deem to be the head of the prosecution
team . . . to ask your paralegals or instruct your paralegals . . .
to go upstairs this afternoon and make an utterly new, top to bottom,
absolutely thorough, no exceptions whatsoever, review of everything to which
the defendants may have a right of discovery or by virtue of agreements that
have been reached or orders that I've issued.

* * *

I want you to be able to tell me yourself . . . that there is not going to be any
further basis – I can't expect you to say that no defense attorney is going to
stand up, but I want you to be able to assure me by tomorrow morning that
everything that has ever been asked for which there was an agreement to
produce or a duty to produce has been turned over.
*Everything, right to the end of the case. Not piecemeal, not because
something was found last night, everything.*  (Emphasis added.)

The next day, April 7, 2011, the prosecution assured the Court that it had conducted a "top-
to-bottom review of discovery" and that "[w]e have done what we believe not only meets
our obligation but exceeds it."  Despite that representation, however, none of the Guernsey
transcripts had yet been turned over.  Nor had the 302 of Fernando Basurto, who testified
that very day.  Furthermore, not until it rested its case on May 3, 2011, did the Government
produce the 302 for a former LMC employee (Patrick Rowan) that was potentially
exculpatory and a second 302 for Fernando Mayo Basurto, whose role is described below.
In its supplemental opposition to this motion, the Government attributed these delays to
"record-keeping inaccuracy . . . ."  (Dkt. 642, p. 47.)

### 2.  <u>Wrongful Obtaining of Co-Defendant's Privileged</u><br><u>Communications and Misrepresentations About It</u>

Co-Defendant Angela Aguilar was in custody throughout the pre-trial and trial
proceedings.  From September 2010 through the conclusion of the trial she was housed at
the local Metropolitan Detention Center ("MDC").  On or about January 18, 2011, the

Government, acting through an AUSA who was not a member of the prosecutive team but instead was part of a so-called "filter team," filed an *ex parte* application, under seal, to permit the prosecutive team to obtain tape recordings of certain of Angela Aguilar's "jailhouse" telephone conversations which the Bureau of Prisons ("BOP") had recorded. The Court responded by issuing an order requiring further information. In response, on January 28, 2011, the filter team AUSA disclosed to the Court that the recorded calls were between Angela Aguilar and her co-Defendant husband, Enrique Aguilar. The recordings were made pursuant to standard procedures, which included providing sufficient notice to inmates about the MDC's recording practices. The application asserted that the recording of the calls did not violate the marital communications privilege because Angela was on notice that they would be recorded and that turning them over to the prosecutive team could lead to information that would help locate her fugitive husband Enrique. The Court granted that application.

Later, the Government disclosed that as early as December 9, 2010, the local AUSA who was the lead prosecutor had asked BOP representatives at the MDC to provide him with not just those telephone communications, but with copies of Aguilar's e-mail communications as well, and that the prosecution did obtain those e-mails, some of which contained exchanges between Angela Aguilar and her attorneys. The prosecutors never requested Court permission to obtain them. Moreover, in opposing Angela Aguilar's later-filed motion to suppress her in-custody communications, the Government misrepresented how it had gone about obtaining such e-mail communications. It claimed, "Because the Government recognized that Aguilar's prison <u>communications</u> [not "telephone calls"] might be privileged, the Government established a 'taint' team, to receive and review the emails and calls. That taint team then requested court authorization to disclose the <u>communications</u> to the prosecution team." (Dkt. 295, p. 2.) (Emphasis added). That was simply untrue. Indeed, in its written opposition to another motion filed still later by Aguilar's attorney, the Government admitted that "[t]he Court's order specifically referred [only] to telephone calls. However, the Government applied the order to both telephone calls and e-mail messages." ( Dkt. 353, pp. 4-5, n.3.)

In short, as the prosecution was forced to admit, as a result of its unauthorized conduct, it obtained communications between Aguilar and her attorneys, and those e-mails were disclosed to the trial team. (*Id.* at 5.) The Court granted Aguilar's motion to suppress that evidence.[14]

---

[14] Government misconduct directly affecting only Angela Aguilar is relevant to this motion filed by the LMC Defendants for at least two reasons. First, the broad legal principle

### 3. <u>Evidence</u> <u>About</u> <u>ABB</u> <u>and</u> <u>Questioning</u> <u>of</u> <u>Basurto</u>

At all times the Government lacked any evidence that LMC had anything whatsoever to do with either ABB or Sorvill. Nevertheless, the prosecutive team repeatedly attempted to show a link between what ABB allegedly did in bribing CFE through Sorvill and what LMC allegedly did in bribing CFE through Grupo. Examples of some of those efforts are set forth in the preceding discussion of the search warrant affidavit executed by Special Agent Binder, as well as the grand jury testimony of Agent Guernsey.

Just before the return of the First Superseding Indictment in this case which added the Lindsey Defendants to the previous charges against the Aguilars, the prosecutor who had handled the ABB cases in Texas wrote an e-mail to Fernando Maya Basurto's lawyer. Fernando Maya Basurto had pled guilty in one of the ABB cases. The prosecutor disclosed that he would be called as a witness in this case

> to testify as to what he understands Sorvill is and, as 404(b) evidence, the ABB bribery scheme, including the corrupt actions of Enrique Aguilar and Nestor Moreno. He doesn't know anything directly about the corrupt company directly involved in the LA case (Lindsey Manufacturing). But the defense has raised the argument that the yacht, Ferrari, and AmEx payments were innocent gifts to a friend. We're going to put forth evidence about the pattern of bribery.

Before trial, the Government moved for leave to introduce evidence about ABB's dealings with Sorvill. The Court denied the motion, but granted the Government permission to renew the request at trial. A few days later, on April 6, 2011, the Government put Fernando Maya Basurto on the stand. He was in prison garb, having pled

---

that underlies all the various grounds requiring or allowing dismissal for misconduct is that in every <u>case</u> the prosecution has the duty to comply with its legal obligations. "Every <u>case</u>" means just that. Nothing in *United States v. Parker*, 241 F.3d 1114 (9th Cir. 2001), which the Government cited at the hearing, negates that principle; that case is only about whether one defendant was prejudiced by the admission of evidence against a co-defendant. Second, the Lindsey Defendants were accused of conspiring with Enrique Aguilar, and both Aguilars were accused of conspiring with each other. Indeed, Angela was referred to in overt acts 60 and 72 of the conspiracy charges against the Lindsey Defendants. The Government tried to establish a seamless thread of corruption.

guilty to conspiracy to violate the FCPA by helping ABB bribe CFE officials.  The Government elicited testimony about his dealings with CFE and about the roles Arturo Hernandez and Nestor Moreno played at CFE.  This evidence came in as part of the Government's case against the Aguilars.  After the jury was excused for the day the Court had an extensive colloquy with several of the lawyers on both sides.  The issue was whether the prosecution would be permitted to elicit testimony from Basurto about invoices sent to him by Sorvill in connection with the ABB-CFE contracts.  The Court ordered the Government to file a written proffer.  It did, and the next morning there was another lengthy colloquy.

In that colloquy the DOJ prosecutor who had handled the Texas cases said that Basurto would testify that the Sorvill invoices he dealt with *vis-a-vis* ABB were false and that they were used to funnel money to CFE officials, including Nestor Moreno, one of the recipients of the alleged bribes in this case.  To demonstrate the relevance of these invoices, the DOJ prosecutor mainly pointed to what a jury could reasonably infer about the roles of Defendants Enrique Aguilar and Angela Aguilar.  But she also argued that the evidence was necessary to rebut the Lindsey Defendants' anticipated defense that the contracts LMC obtained were lawful on their face and resulted from the superiority of LMC's products.

There then ensued this colloquy:

THE COURT:  Why don't you have a representative of CFE come in and say, we can't tell whether they're real bribes that are going on necessarily just because the documents look kosher?

THE PROSECUTOR:  Your honor, under Mexican law, Mexican officials are not allowed to come and testify in U.S. court.  So, in order to do that, we would have to do a Rule 15 deposition, and frankly, there was no time.

THE COURT:  Ah, that seems to have been what's plaguing the government team throughout.  I've had some silent views about that for quite awhile.  There may not have been any time, but that doesn't mean there wasn't any opportunity.

So, you want to get around the pressures of time and the rules of evidence by establishing a response to the defendants' position that nothing

looked unusual, or phony, or bribe-laden, through Basurto, who will say that he was told the same thing, or managed to get away with the same thing, on two utterly different contracts.  It won't work.

\* \* \*

THE PROSECUTOR:   Your Honor, it's relevant to rebut the defense's defense that there needs to be a strict correlation between the time that bribes were paid and the time that those bribes are passed on.

THE COURT:  This is an absolutely remote, at best, way of proving [that] . . . .

\* \* \*

This is a different case . . . .  These are different bribers, different bribees, different contracts, different time periods.  If this is the only way that the government can address that part of the defendants' defense, then maybe you and your colleagues should evaluate where you are in this case, because that isn't even a way that makes any fundamental sense.

Thereafter, the jury was brought in and the Court gave it this limiting instruction:

THE COURT:  And the reason why we're starting this late is that for quite a while, I was exploring various legal and procedural issues with the various lawyers, all arising out of the testimony that Mr. Basurto started to give yesterday.

I think it's fair to say that in that testimony, Mr. Basurto testified before us about his role in an entirely different conspiracy involving this company known as ABB.  None of the defendants who is in this courtroom have been accused of any involvement in that conspiracy.  None of the defendants in this courtroom have been accused of having any role whatsoever in that case.  This case, in short, does not involve ABB.  That's the other case.

*I've instructed the prosecution to go no further in eliciting testimony from this witness about that other case or about his [Basurto's] role in the other case, so we're not going to have any further testimony about that.* (Emphasis added.)

The Government then proceeded to elicit testimony from Basurto that two phony invoices on Sorvill stationery and containing a handwritten signature in the name of "Enrique Aguilar" were used in the ABB scheme. This evidence was ostensibly for use against the Aguilars, the Court having made it clear that Basurto's testimony was relevant only to that.

In the Government's rebuttal closing argument, however, the AUSA stated that Defendant Lee and certain other witnesses who had worked for LMC had been

> talking about Nestor Moreno [the alleged bribee in this case]. The reason they were talking about Nestor Moreno is because they knew what Fernando Maya Basurto testified to, that he could make things happen at CFE . . . that Nestor Moreno had access to the money.

The lawyer for Defendant Lee objected, pointing to the Court's limiting instruction about Basurto's testimony. The Court overruled that objection, but in retrospect, it should not have. The suggestion that Lee and other LMC witnesses had any connection to Basurto or ever even knew anything about him was not only misleading, but contrary to the Court's ruling. The Court had made it clear that what Basurto learned about Moreno in connection with his (Basurto's) involvement in the ABB case was irrelevant.

## 4. "Willful Blindness" Closing Argument

Immediately before closing arguments were delivered, the Court delivered a copy of the jury instructions to each juror and then read them aloud. Instruction 31 "Foreign Corrupt Practices Act - Definitions" defined "knowledge" as follows:

> A person has knowledge for purposes of the FCPA if: (a) he is aware that he is engaging in conduct, or that a circumstance exists, or that a result is substantially certain to occur; or (b) he has a firm belief that such circumstance exists or that such result is substantially certain to occur. A person is deemed to have such knowledge if the evidence shows he was aware of a high probability of the existence of such circumstance, unless he actually believes such circumstance does not exist.

Before the jury instructions were settled, the Court had rejected the prosecution's requests to give two separate "deliberate ignorance" or "willful blindness" stand-alone instructions.

During the "opening" segment of the prosecution's closing arguments, one of the

DOJ attorneys specifically referred to the Court's instruction and even quoted from it. But he then went on to attempt to explain the rationale for that instruction:

> And why is that in the law? It's because the law is saying you can't turn a blind eye to what is - -

Defendant Lee's lawyer immediately objected, and the Court sustained the objection. But the prosecutor then said,

> Okay. Thank you, Your Honor. I'm sorry. Defendants like Keith Lindsey and Steve Lee cannot see all of this smoke and all of these red flags and then close their eyes.

The prosecutor covered his eyes with his hands to emphasize this argument. Another objection followed immediately.

The Court then said:

> [He]'s not stating the law; he's arguing what he thinks the evidence may have shown and to what extent it complies with the requirements of knowledge. There is no requirement like the one that [the Prosecutor] first alluded to. And keep that in mind, Mr. [Prosecutor].
>
> \* \* \*
>
> THE COURT: The instructions about knowledge are on page 35. [The jurors] are welcome to review those. And you must adhere to those, Mr. [Prosecutor].
>
> THE PROSECUTOR: Yes. Let me be more direct. We submit that all of the evidence in this case proves beyond a reasonable doubt that Keith Lindsey was aware of a high probability of the existence that some of the money that they were paying to Enrique Aguilar would be used to pay foreign officials. We submit that all of the evidence when taken together proves that Steve Lee was also aware of a high probability of the existence of that circumstance.

The talented prosecutor in question was delivering a powerful closing argument despite facing stringent time limitations that the Court imposed (they were imposed on all counsel), and he was not directly or personally responsible for the numerous other forms of misconduct. Given the stress and fatigue that lawyers experience at the end of a lengthy, high-stakes trial, his misstatement and the physical act of covering his eyes, thereby conveying a "willful blindness" standard to the jury, could have been entirely

unintentional.  But a misstatement it was.

Defendants argue that "given that this case consisted of entirely circumstantial evidence, evidence that was weak at its best, the improper willful blindness argument . . . undoubtedly affected the jury to the prejudice of the defense."  They are probably right.  Whether the Government could prove that Lindsey and Lee had the required culpable knowledge was one of the hardest-fought issues in the case.  Now that the Court has had the benefit of appraising the prosecutor's dramatic argument in light of the supplemental briefing that the Court ordered both sides to file, the Court finds that this improper argument undoubtedly resonated with at least some of the weary jurors.

\* \* \*

The following two additional examples of wrongful conduct were either not directly prejudicial to the Lindsey Defendants or are susceptible to being characterized fairly as a display of vigorous advocacy and permissible tactics.  That being so, it would be unfair to consider them as reflecting the same degree of culpability.  Nonetheless, they may properly be considered in the mix of wrongs warranting the overturning of the guilty verdicts.

## 5.  <u>School</u> <u>Payments</u> <u>For</u> <u>Nestor</u> <u>Moreno's</u> <u>Son</u>

Through their summary witness, FBI Agent Dane Costley, the Government introduced a flow chart, Exhibit 30, which purported to show that $145,000 out of the $5.9 million that LMC paid to Enrique Aguilar's company Grupo was paid to Nestor Moreno and to others for his benefit. $29,500 was paid to an academy that Moreno's son attended.

After the trial, Defendants learned that the prosecutor who had handled the *United States v. O'Shea* case in Texas and was part of the trial team had in the *O'Shea* case attributed the source of that very tuition payment to ABB, not to LMC.  The Government does not dispute this.  Nor could it; it is alleged as overt act 16(o) in the *O'Shea* indictment.  Supp. Brief, Exh. F, p. 20.  Defendants argue that *Brady* required this prosecutor to disclose to them that she was attributing one of the very payments for which LMC was being prosecuted to ABB.

At yesterday's hearing, the Government tried to demonstrate that it *did* disclose its contentions to the Lindsey Defendants' counsel, but the Court finds that the claimed disclosure was so indirect, incomplete and buried as to fall far below what disclosure would entail.

The Government initially argued that it was not unethical for the same prosecutor to seek to convict different defendants (LMC and O'Shea) in different cases in different jurisdictions based in part on a payment that the two defendants could not both have arranged. Instead, its written opposition pooh-poohed the issue by claiming that "Agent Costley merely testified that the military school payments came from Sorvill." Exhibit 30 did not "merely" suggest that, however; it conveyed that the source of the military academy payment was LMC, with the monies having flowed from LMC to Grupo to Sorvill to the academy.

At the hearing the Government argued that there is not really anything inconsistent about its allegations in the *O'Shea* case and its use of exhibit 30 and Costley's testimony in this case, for two reasons: (1) regardless of the precise source of the money, the tuition payment was made directly by Sorvill, which was Enrique Aguilar's company and (2) money being fungible, and the Government supposedly not being required to "trace" corrupt payments with particularity to a particular defendant, - - either ABB or LMC - - there is no rule or principle precluding it from alleging that both defendants were responsible for the payment.

The Court rejects the Government's position about tracing (see fn. 21). More importantly, the Government's explanation misses the point. *See Bradshaw v. Stumpf*, 545 U.S. 175, 125 S.Ct. 2398 (2005) and *Jacobs v. Scott*, 513 U.S. 1067, 1070, 115 S.Ct. 711 (1995) for cases addressing the "serious questions [that] are raised when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens . . . ." *Id.* In any event, the Government's conduct also illustrates just how far the Government was willing to go to make some connection between LMC and Sorvill, regardless of how misleading was the link.

## 6. <u>Testimony</u> of <u>Laura</u> <u>Garza</u>

Laura Garza was a witness against Angela Aguilar. She functioned as a notary public in Texas and testified to Angela having executed a key document. But when she first was interviewed by the Government team shortly before the First Superseding Indictment was returned, she notified them that she had not recorded Angela's authorization in her notary book. The Government allowed her to keep the book. When she returned to Los Angeles to prepare for her trial testimony several months later, the missing entries had been added to the book. Yet not until the trial was well underway and shortly before Garza testified did the prosecution disclose to the Defendants that this major gap in its evidence had been thereby "fixed."

## C.     DEFENDANTS' OTHER CLAIMS OF MISCONDUCT

The Court rejects the Defendants' other claims of misconduct for the following reasons.

### 1.  <u>Witness</u> <u>List</u>

The Government identified 78 witnesses in its Feb. 28, 2011, witness list. (Dkt. 208.)  At trial it called many fewer witnesses - - only 23 or 24.  Among them were five persons not mentioned on that witness list, however, including Agent Guernsey and Monica Guerra.  Although the Government's poor trial preparation and shoddy questioning of some witnesses left gaps in its case,[15] the Government did not engage in deceptive conduct.  For the Government to have streamlined its witness list and to have dealt with late-perceived gaps was not unusual.

### 2.  <u>CFE</u> <u>Meeting</u> <u>Memorandum</u>

For reasons the Court still does not comprehend, evidently it was not until February 11, 2011, that the prosecutors first met with representatives of the very Mexican entity with which LMC did business - - CFE.  This was more than four months after the original indictment.  The Government generated a memorandum of the meeting, but not until March 18, 2011, some five weeks later.  The memorandum contained exculpatory material within the scope of *Brady*.  It stated  that the CFE officials could find nothing wrong with the allegedly bribe-procured LMC contracts on their face.  The memorandum was "Federal Expressed" to Defendants on March 18, 2011, and received the next day.  This was two weeks before opening statements were delivered.  The nearly five week delay in producing this memorandum was troubling to the Court, and it still is.  Rule 16 and *Brady* require timely disclosures.  But the Defendants did receive it and their lawyers made considerable use of it at trial.

### 3.  <u>Summary</u> <u>Witness</u> <u>Dane</u> <u>Costley</u>

Defendants argued vigorously during trial and argue again on this motion that the

---

[15] *E.g.*, the prosecutors sought and obtained permission from the Court to allow them to recall Alma Patricia Cerdan Saavedra as a witness. But when the Government unsuccessfully attempted to go beyond the scope of additional inquiry that the Court had permitted, the Court was forced to clamp down.

Government violated their Sixth Amendment right of confrontation by designating FBI Special Agent Dane Costley as the prosecution's summary witness. The Court disagrees. It is no doubt the case that Costley was given that key responsibility as part of the Government's intended strategy of keeping Co-Case Agents Guernsey and Binder off the stand, in order to prevent Defendants from inquiring into the pre-indictment investigation. But that does not mean that the Defendants' rights were violated. The cases they cite do not support that proposition. Nor did Defendants suffer any prejudice from the Government's designation of Costley as the summary witness. Thanks to the defense lawyers' cross-examinations of Agent Guernsey, whom the Government had been forced to call anyway (to provide chain-of-custody and foundation testimony), the jury became aware of many of the defects and gaps in the Government's investigation and in Guernsey's grand jury testimony. Moreover, Defendants' cross-examination of Costley illustrated weaknesses in the Government's summary charts about which Costley testified on direct.

### 4. <u>Jean-Guy</u> <u>Lamarche</u> <u>and</u> <u>Closing</u> <u>Arguments</u> <u>About</u> <u>Him</u>

After including this Canadian witness on its witness list, the Government wound up not putting him on the stand, because (it contended) he refused to show up, even though he had been subpoenaed. Defendants claim that the Government interfered with their right or ability to complete their efforts to interview Lamarche. The Court disagrees. The evidence falls far short of demonstrating that.

The Court permitted the Government to introduce various e-mails that Lamarche and Defendant Lee exchanged, pursuant to a carefully-framed limiting instruction that was given to the jury, to the effect that the e-mails could be considered only for the purpose of establishing what, if anything, Lee knew about Aguilar's supposed connections to CFE officials and what, if anything, Lee intended Aguilar would do to help LMC secure contracts from CFE. *See* Court Exhibits D and E. Defendants contend that the Government's references in closing arguments to Lamarche and the e-mails was improper. There is no clear basis for the Court to find misconduct. On one occasion the DOJ prosecutor who delivered the closing argument stated that the jury could consider a certain e-mail (Exhibit 959) "for the truth, standing by themselves" [sic] (May 6, 2011, R.T. 4106), but that was not improper because one part of that e-mail was written by Defendant Lee. The prosecutor otherwise was careful to abide by the Court's limiting instruction. Moreover, during his closing argument the Court further instructed the jury that it "may not find" (not merely "may not assume") merely  from the statements made by Lamarche " that whatever Lamarche was saying is true or accurate." May 6, 2011, R.T. 4236.

# IV.
# LEGAL ANALYSIS

## A.  DISMISSAL OF THE INDICTMENT IS NOT BASED SOLELY ON MISCONDUCT BEFORE THE GRAND JURY

The motion to dismiss that led to this ruling was filed before the jury returned its guilty verdicts, and it focused almost entirely on Agent Guernsey's false or misleading grand jury testimony.

The Government cites *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369 (1988), for the proposition that unless the proceedings before a grand jury were fundamentally unfair, errors committed at that stage are harmless, and as such preclude dismissal.  In that case, the district court dismissed the indictment *before* trial, based on an overall finding that the prosecutors' conduct, and that of their agents, prevented the grand jury from acting independently of the prosecution.  In upholding the Tenth Circuit's reversal of the district court's ruling, the Supreme Court held that "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants . . . [and] may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)."  *Id.* at 254, 108 S.Ct. at 2373.[16]

Moreover, if a petit jury convicts the defendant of charges contained in a wrongfully obtained indictment, "any error in the grand jury proceeding connected with the charging decision [is deemed] harmless beyond a reasonable doubt." *Mechanik,* 475 U.S. at 70, 106 S.Ct. at 942.  When that is the case, dismissal of the indictment may still be appropriate only if "the structural protections of the grand

---

[16] Despite this broad language, however, the Court went on to adopt a rather expansive standard for measuring prejudice, based on Justice O'Connor's concurrence in *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938 (1986):  "[D]ismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  *Id.* at 256.  Under Justice O'Connor's standard in *Mechanik,* this Court has strong reason to find, and does find, that Agent Guernsey's untruthful testimony does create "'grave doubt' that the [grand jury's] decision to indict was free from the substantial influence of such violations."

jury . . . [were] so compromised as to render the proceedings fundamentally unfair." *Bank of Nova Scotia, supra*, 487 U.S. at 257, 108 S.Ct. at 2374. *Accord United States v. Bingham*, 653 F.3d 983, 998 (9th Cir. 2011). As the Court in *Bingham* noted, "'[t]he only structural errors the Supreme Court has recognized are racial and gender discrimination in the selection of grand jurors.'" *Id.* (citing *Bank of Nova Scotia,* 487 U.S. at 257, 108 S.Ct. at 2369). There is no basis to find structural errors here.

Unlike in *Bank of Nova Scotia,* however, the issue now is not whether the indictment should be dismissed solely because of misconduct in and before the grand jury. Although such misconduct was the critical component that triggered the motion to dismiss that was filed on May 9, 2011, the prosecution of this case was marred by a much wider range of misconduct.

## B.      GENERAL PRINCIPLES GOVERNING PROSECUTORIAL CONDUCT

Perhaps the most-frequently cited decision about the exacting standard to which prosecutors must adhere is that of the unanimous Supreme Court in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629 (1935), reversing defendant's conviction for conspiring to possess counterfeit notes. The prosecutor's misconduct consisted of misstating the facts in his cross-examination of witnesses, putting words into the mouths of witnesses, bullying witnesses "and, in general, of conducting himself in a thoroughly indecorous and improper manner." *Id.* at 84, 55 S.Ct. at 631. Although by current standards this hardly seems outrageous, and although the trial judge sustained objections and instructed the jury to disregard certain questions and testimony, the Supreme Court concluded that it was "impossible to say that the evil influence upon the jury of these acts of misconduct was removed by such mild judicial action as was taken." *Id.* at 85, 55 S.Ct. at 632-633. The Supreme Court went on to promulgate a standard for prosecutive conduct that remains in place:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done . . . He may prosecute with earnestness and vigor - - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones . . . In these circumstances prejudice to the cause of the accused is so highly probable

that we are not justified in assuming its nonexistence.  If the case against
Berger had been strong, or, as some courts have said, the evidence of his
guilt 'overwhelming,' a different conclusion might be reached.

*Id*. at 88-89, 55 S.Ct. at 633.  In applying *Berger*, the Ninth Circuit later summarized
the point succinctly:  "The prosecutor's job isn't just to win, but to win fairly, staying
well within the rules."  *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993).

## C. FAILURE TO TIMELY DISCLOSE THE GRAND JURY TRANSCRIPTS CONSTITUTED A *BRADY* VIOLATION

Although the pronouncement in *Berger* is important, it is just that - - a
pronouncement.  The Supreme Court imposed more concrete  requirements on
prosecutors in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).  There the
Court held that "the suppression by the prosecution of evidence favorable to an
accused upon request violates due process where the evidence is material either to
guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
*Id.* at 87, 835 S.Ct. at 1196-97.

In *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383 (1985),
the Supreme Court held that for purposes of *Brady* evidence is material "if there is a
reasonable probability that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different.  A 'reasonable probability' is a
probability sufficient to undermine confidence in the outcome."

The Supreme Court further clarified "materiality" in *Kyles v. Whitley*, 514 U.S.
419, 115 S.Ct. 1155 (1995):

[A] showing of materiality does not require demonstration by a
preponderance that disclosure of the suppressed evidence would have
resulted ultimately in the defendant's acquittal (whether based on the
presence of reasonable doubt or acceptance of an explanation for the
crime that does not inculpate the defendant) . . . . The question is not
whether the defendant would more likely than not have received a
different verdict with the evidence, but whether in its absence he
received a fair trial, understood as a trial resulting in a verdict worthy of
confidence.  A 'reasonable probability' of a different result is
accordingly shown when the government's evidentiary suppression

'undermines confidence in the outcome of the trial.

*Id.* at 434, 115 S.Ct. at 1566 (citing *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381) (other citations omitted).

In *Kyles*, the defendant had been convicted of first-degree murder. On *habeas* review the Supreme Court overturned his conviction because the government had withheld, *inter alia*, (1) six contemporaneous eyewitness statements, (2) statements made to the police by a key informant who was possibly the killer, and (3) the printout of license numbers parked at crime scene, which did not include Kyles's. The informant was never called to testify at trial. After stressing that under *Brady* and *Bagley* the test for materiality is that suppressed evidence "must be considered collectively, not item by item," *id.* at 436, 115 S.Ct. at 1567, the Court noted that by the State's own admission, the informant " was essential to its investigation and, indeed, 'made the case' against Kyles." *Id.* at 445, 115 S.Ct. at 1571. Had his statements been disclosed before trial, Kyles's lawyer "could have . . . attacked the reliability of the investigation in failing even to consider [the informant's] possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted." *Id.* at 446, 115 S.Ct. at 1572.

The dissenting opinion suggested that it would have been irrational for jurors "to count the sloppiness of the investigation against the probative force of the [prosecution's] evidence . . . ." The majority dismissed that notion: "When . . . the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Id.* at 446, n.15, 115 S.Ct. at 1572.

In at least two cases the Ninth Circuit has recognized the importance of the holding in *Kyles* that facts demonstrating a skewed or biased investigation may constitute *Brady* material that a Defendant is entitled to obtain and a jury permitted to consider. *See Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) ("Had this evidence of [the chief prosecution witness's] prolificacy in his profession been known, the defense could have used it to question the thoroughness or good faith of an investigation that did not include [him] as a suspect.") (citing *Kyles, 514 U.S.* 444-48, 115 S.Ct. at 1571-72.); *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) (quoting *Kyles* and referring to "the utility of attacking police investigations as

'shoddy'").[17]

The thrust of the Lindsey Defendants' *Brady* argument is that the Government failed to turn over - - indeed, refused to turn over - - the transcripts of Agent Guernsey's grand jury testimony until some ten days after the jury trial had begun, and then only after being ordered to do so.[18]  Defendants point to the prosecutors' admission that they did not designate Guernsey as the Government's summary witness because they wanted "to limit the [Defendants'] ability to introduce [a] type of defense" that would "put the investigation on trial . . . ."  April 15, 2010, R.T. at 1697-1698.  The Lindsey Defendants rely heavily on *Kyles* for the proposition that

> evidence of investigative failures is *Brady* material . . . .  In *Kyles*, the court noted that had the defense been provided *Brady* materials, the defense could have challenged "the thoroughness and even good faith of the investigation" . . . and that "[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to
>
> charge the defendant, and we may consider such use in assessing a possible *Brady* violation."

Supp. Memo at 38, citing *Kyles*, 514 U.S. at 445-446, 115 S.Ct. at 1571-1572.

The Government argues that Defendants' characterization of *Kyles* is too broad.  It offers a narrower interpretation:

> [P]roperly read, *Kyles* does not support the defendants' overbroad position because investigative flaws can be exculpatory in some circumstances yet irrelevant and prejudicial in others . . . *Kyles* stands for the proposition that information concerning the nature of the investigation can be exculpatory within the meaning of *Brady* [only] (1) "[w]hen . . . the probative force of evidence depends on the circumstances in which it was obtained," or (2) when "the thoroughness

---

[17] The Government cites *United States v. Waters*, 627 F.3d 345, 353 (9th Cir. 2010) for the proposition that *Kyles* is inapplicable here.  The Court disagrees.  Indeed, the citation is misplaced.

[18] As it turned out, the Government actually failed to turn over one of the transcripts until almost seven weeks after the case went to the jury, as noted above.

and even the good faith of the investigation" is lacking in that the investigators failed to "even consider" information indicating that the defendant is innocent.

Government's Resp. at 55-57. Even accepting the Government's gloss on *Kyles*, the requirements for finding a *Kyles*-based *Brady* violation would be satisfied. The withheld transcripts show that at the investigative stage the Government failed to consider a number of factors pointing to innocence, including LMC's prior dealings and contracts with CFE, the several-year delay between the hiring of Enrique Aguilar and the first alleged bribe payment, the lengthy intervals between deposits from LMC into Grupo's account and Grupo's payments for the yacht and AMEX bills, and the presence and use of substantial amounts of non-LMC funds in the Grupo account.

However, unlike in *Kyles,* here the person whose misleading grand jury testimony was central to the late-developed defense that the Government's evidence was suspect because of a biased investigation *did* testify. But Agent Guernsey testified only because the Government was forced to put her on the stand to lay the foundation for the admission of other evidence. And by April 15, 2011, when the Government first turned over the full transcripts of three of her appearances before the grand jury, the trial had been underway for more than ten days. Defendants had already been attempting to discredit the Government's case, but their efforts were significantly impeded because they lacked the most complete and compelling evidence that the Government investigation had been tainted by unfounded and misleading grand jury testimony. Moreover, their cross-examinations lacked a focus, not having been previewed in opening as part of a coherent theme.[19]

In their opening statements defense counsel were not in a position to cite grand jury transcripts as support for what eventually became part of their defense. Lacking the factual support they needed, they could not and did not assert, in effect, "The

---

[19] Throughout the trial defense counsel indulged in lengthy and repetitive cross-examinations of many witnesses. This evidently played into the Government's hands, because those time-consuming examinations undoubtedly led some jurors to conclude that "there must be something to this prosecution after all - - else why are Defendants resorting to such nit-picking?" In fairness to defense counsel, however, at least some of their questioning probably resulted from their having been forced to play "catch up" as a result of the prosecution's late disclosures and changes to its witness lists.

evidence will show that the Government team failed to conduct a complete and fair investigation. In fact, the Government obtained the very charges in the indictment through false and misleading grand jury testimony of an FBI agent. The prosecution has been scrambling to find out what happened ever since. Had they done their homework properly, they would have learned long before now that there was no crime." Had defense counsel been able to deliver such an opening statement, it is likely that at later stages the jury would have understood the point of their cross-examinations and would have viewed the Government's evidence with great skepticism. Instead, the defense attorneys' opening statements focused mostly on "humanizing" their respective clients, such as by describing their unblemished pasts and their good character. *See* April 5, 2011, R.T. at 329-359.

In an exceptionally complicated case such as this, opening statements assume even greater importance than is usually the case, because they enable counsel to articulate their key themes at the critical point of "first impression." If one side is prevented from doing so, its task of persuading jurors to see the case its way is made more difficult. That is what happened here. The Government's failure to timely produce the Guernsey transcripts before opening statements prevented the Lindsey Defendants' lawyers from previewing for the jurors what they later tried to develop as a major part of their defense. This was prejudicial not only to the Lindsey Defendants but to one of the core assumptions underlying the adversary process: that the truth will emerge more completely and for the benefit of the fact-finder if the

lawyers on both sides are required to, and allowed to, contend on a level playing field.

The Government insists that its intention in deciding not to call Guernsey as a witness - - and thereby avoid having to produce the grand jury transcripts - - "was to forestall an <u>improper</u> attack on the investigation." Government's Resp. at 57 (emphasis in original). Even if the Government's motive was such, that would not permit it to disregard its *Brady* obligations. For *Brady* does not apply only when the Government proceeds with bad intent; the doctrine requires disclosure "where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution." Brady, supra,* at 87 (emphasis added).

In *Kyles*, the majority noted that "the question is not whether the state would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." 514 U.S. at 453, 115 S.Ct. at 1575. Combined with the other examples of misconduct

discussed in this ruling, the Court finds there is no basis to have such confidence.

The belated and incomplete disclosure of the Guernsey grand jury testimony was prejudicial for an entirely different reason as well: it prevented the Lindsey Defendants from presenting important evidence of potential grand jury bias to the Court that might have warranted dismissal even before trial began, thereby sparing Defendants the costs, travail and attendant burdens of a more than five week ordeal. In *United States v. Samango,* 607 F.2d 877 (9th Cir. 1979), the Ninth Circuit upheld the district court's pre-trial dismissal of an indictment as a proper exercise of its supervisory power based on the trial court's findings that the prosecutor subjected the grand jurors to various questions, statements, insinuations and evidence that "served no other purpose than calculated prejudice." *Id.* at 883-84 (citing *United States v. Basurto*, 497 F.2d 781, 786 (9th Cir. 1974), which found that an indictment based partially on perjured testimony caused a due process violation requiring reversal). Noting that "[t]he prosecutor has a duty of good faith to the court, the grand jury, and the defendant," the Ninth Circuit found that "the manner in which the prosecution obtained the indictment represented a serious threat to the integrity of the judicial process." *Id.* at 885. Because the court's goal in exercising supervisory powers "[is] to protect the integrity of the judicial power," *id*. at 881, the court found that "the cumulative effect of the . . . errors and indiscretions, none of which alone might have been enough to tip the scales operated to the defendants' prejudice by producing a biased grand jury." *Id.* at 884.

It is true that before the verdicts were returned, Defendants filed this motion. But by then the jury was about to begin deliberating, and soon thereafter it returned the verdicts. As discussed above in Section IV A, once there is a jury verdict, the task of arguing for dismissal of an indictment based solely on errors in a grand jury proceeding becomes nearly insurmountable.

The elements of a *Brady* violation are (1) the suppression (2) of evidence that is material and favorable to the accused and (3) the suppression of which causes prejudice to the defendant. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936 (1999). All such elements are present here. In short, by withholding the grand jury transcripts the Government violated its duties under *Brady*.

## D.    THE COURT'S SUPERVISORY POWERS

As demonstrated above, the Government's misconduct went way beyond the

delayed and incomplete production of the Guernsey grand jury transcripts. It included procuring search and seizure warrants through materially false and misleading affidavits; improperly obtaining attorney-client privileged communications; violating court orders; questioning witnesses improperly; failing timely to produce information required under *Jencks*; and engaging in questionable behavior during closing arguments. Even if the suppression of the Guernsey transcripts did not constitute a *Brady* violation, overall the Government's conduct was improper, and it warrants exercise of the Court's supervisory powers.

In *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008), a case upholding the mid-trial dismissal of an indictment, the Ninth Circuit stated,

> An indictment may be dismissed with prejudice under either of two theories. [First, a] district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation. [Second, i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers.

524 F.3d at 1084 (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)).

\* \* \*

> [A] district court may exercise its supervisory power "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991).[20]

*Id.* at 1085. Although now this case is at a different procedural stage than in *Samango* and *Chapman* - - guilty verdicts having been returned - - the broad

---

[20] In *United States v. W.R. Grace*, the Ninth Circuit clarified that the exercise of the Court's inherent powers is not limited to the three grounds enumerated in *Simpson*. 526 F.3d 499, 511 n.9 (9th Cir. 2008) (*en banc*).

teachings of those cases remain applicable. Indeed, numerous decisions of the Ninth Circuit Court of Appeals have reversed convictions because of multiple wrongful acts that, in the aggregate, warranted the exercise of supervisory power. For example, in *United States v. Kojayan*, the Ninth Circuit found that prosecutorial misconduct during trial deprived the defendants of due process of law. 8 F.3d at 1324. It went on to add that "the judiciary - - especially the court before which the primary misbehavior took place - - may exercise its supervisory power to make it clear that the misconduct was serious . . . and that steps must be taken to avoid a recurrence . . . ." *Id.* at 1325. In *United States v. Sanchez*, 176 F.3d 1214, 1225 (9th Cir. 1999) the court found that the prosecutor engaged in several acts of misconduct during the trial and concluded, "The cumulative effect of these errors, when viewed in the context of the entire trial, compels a reversal in this case. We are persuaded that it is more probable than not that the prosecutor's misconduct materially affected the verdict." In *United States v. Lopez*, 4 F.3d 1455 (9th Cir. 1993), a case the Government cites, the Ninth Circuit reviewed several of its prior decisions and summarized the requirement thusly:

> [I]n order to justify dismissal of the indictment under the court's supervisory powers, there must be "some prejudice to the accused by virtue of the alleged acts of misconduct." . . . [T]he idea of prejudice entails that the government's conduct "had at least some impact on the verdict . . . ."

*Id.* at 1464.

This Court is persuaded that the multiple acts of misconduct described above undoubtedly affected the verdicts and thus substantially prejudiced the Lindsey Defendants. The prejudice here is palpable once the prosecution and trial are assessed as a whole. Beginning even before the jury was selected and continuing throughout trial, the Defendants were thrown off balance by being forced to devote enormous effort to responding to and redressing serious and prejudicial wrongs, while at the same time having to defend themselves against the charges. Within only one year after the return of the First Superseding Indictment - - an unusually brief period for this kind of case - - the docket had almost 700 entries, many of which consist of the motions, *ex parte* applications, oppositions, hearings, and rulings necessitated by the prosecution's astonishing number of "mistakes" (as the Government chooses to characterize them) discussed above.

A clearly established additional basis for finding prejudice is the weakness of the Government's case. In *United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th

Cir. 2005), the Ninth Circuit stated,

> Another important factor contributing to the prejudicial effect of
> improper statements is the strength of the case against a defendant.
> When the case is particularly strong, the likelihood that prosecutorial
> misconduct will affect the defendant's substantial rights is lessened
> because the jury's deliberations are less apt to be influenced. But as the
> case becomes progressively weaker, the possibility of prejudicial effect
> grows correspondingly.

*See also United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (reversing a
conviction for aggravated sexual assault) (citations and quotations omitted):

> In some cases, although no single trial error examined in isolation
> is sufficiently prejudicial to warrant reversal, the cumulative effect of
> multiple errors may still prejudice a defendant. . . . Where, as here, there
> are a number of errors at trial, a balkanized, issue-by-issue harmless
> error review is far less effective than analyzing the overall effect of all
> the errors in the context of the evidence introduced at trial against the
> defendant. In those cases where the government's case is weak, a
> defendant is more likely to be prejudiced by the effect of cumulative
> errors.

The case against the Lindsey Defendants was far from compelling. That the
jury returned its verdicts after some seven hours of deliberation is not a reliable
indication of just how close the evidence was, contrary to the Government's
contention. For example, the key issue as to the Lindsey Defendants was whether
they knew that the monies that LMC would and did pay to Grupo would be used by
Enrique Aguilar to bribe CFE officials, and whether they intended that to happen.
There was no direct evidence of such intent. There were no oral admissions (secretly
recorded or otherwise); no writings acknowledging the payments were corrupt; no
evidence of furtive conduct, except perhaps for the disputed bookkeeping
reclassification of one contract, described above. The circumstantial evidence, at
best, was murky. Moreover, regardless of what the Lindsey Defendants knew or
intended, for the most part there was no clear evidence that if Enrique Aguilar bribed
Moreno and Hernandez it was with LMC funds. Although Aguilar was retained as a
sales representative in 2002, the first "bribe" paid to or on behalf of Moreno was not
made with funds from Aguilar's Grupo account until 2006. Furthermore, except for
the funds used to purchase the Ferrari, there was no temporal connection between the

LMC payments to Grupo and the use of funds in Grupo's account to pay for benefits to Moreno.[21]

Given the teachings of *Weatherspoon* and *Frederick*, the multiple acts of misconduct here substantially prejudiced the Lindsey Defendants.


### E.    REMEDY

"Because it is a drastic step, dismissing an indictment is a disfavored remedy." *United States v. Rogers,* 751 F.2d 1074, 1076-77 (9th Cir. 1985) (citing *United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 416 (1966)). But as stated in *United States v. Struckman*, 611 F.3d 560, 577 (9th Cir. 2010), the Ninth Circuit "has recognized that dismissal with prejudice may be an appropriate remedy for a *Brady* or *Giglio* violation using a court's supervisory powers where prejudice to the defendant results and the prosecutorial misconduct is flagrant. *See United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008); *Chapman*, 524 F.3d at 1077, 1086."

The preceding sections establish why and how the Lindsey Defendants were prejudiced. As for whether the Government's misconduct was flagrant, how could a prosecutor's insertion of a false statement in an FBI agent's affidavit not be flagrant? How could a prosecutor's failure to detect and correct numerous unfounded misstatements of an agent testifying under oath before a grand jury not be flagrant?

---

[21] In the previous portion of this Order that discusses Agent Guernsey's misleading grand jury testimony, the Court characterized the Government's tracing theory as "strained." In response, the Government insists that it "did not rely on tracing" and did not have to. It asserts, as one of the prosecutors argued at the hearing, "Our argument has always been that the funds were commingled. It was the defense's argument . . . that we needed to trace individual dollars to individual benefits received by CFE officers. That was never our theory." Apart from mischaracterizing the Defendants' contentions, this argument wholly ignores that the Government *did* have to prove that LMC knowingly bribed Moreno and Hernandez by making payments to Grupo. It is indisputable that the Government therefore had to show that LMC monies paid to Grupo were used for the Ferrari, the yacht, etc. It also is indisputable that the Government went about doing so by relying on flow charts that purported to show the passage of money from LMC to the bribees. The Government insists that this did not entail "tracing," but any fair and common sense appraisal of what the Government actually offered as evidence shows that it *was* tracing. Exhibit 30 is a fine example.

How could the prosecution's obtaining of privileged communications between a Defendant and her attorney, followed by a misrepresentation about whether the Court had approved it, not be flagrant?  Perhaps the Government's failures to produce the fourth Guernsey grand jury transcript, to turn over the 302s described above, and to comply with the spirit - - and arguably the letter - - of the Court's rulings about ABB evidence all were inadvertent, as the prosecution contended and this Court initially found.  But even those acts were clearly wrongful.  They demonstrate, at best, that the Government was reckless in disregarding and failing to comply with its duties.

In *United States v. Chapman, supra*, the Ninth Circuit upheld the trial court's post-trial dismissal of the indictment and refusal to permit a retrial.  The court said, "The district court considered and properly rejected that argument, [i.e., the government's request to have merely a mistrial declared] because the mistrial remedy would advantage the government, probably allowing it to salvage what the district court viewed as a poorly conducted prosecution.  The court identified myriad weaknesses in the government's presentation during the three-week trial." 524 F.3d at 1087.  The Ninth Circuit then went on to quote approvingly the district court's findings:

> "If this case were to be retried, the government and its witness will not make that mistake again, and that's the advantage that the government gains by its actions here.  It gets a chance to try out its case[,] identify [ ] any problem area[s], and then correct those problems in a retrial, and that's an advantage the government should not be permitted to enjoy."

*Id.  Accord United States v. Fitzgerald*, 615 F.Supp.2d 1156, 1162 (S.D. Cal. 2009).[22]

---

[22] In contrast, in *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011), the court sent the case back to the district court for retrial, instead of dismissing the indictment.  The Ninth Circuit found that the government's failure to disclose various pieces of favorable evidence and information constituted a "*Brady/Giglio*" violation.  But the court stated that it would "not exercise our supervisory authority by dismissing the Superseding Indictment" because "we do not have sufficient evidence to conclude the prosecution 'acted flagrantly, willfully and in bad faith.'" *Id.* at 912-13.  *Kohring* is distinguishable.  First, this Court now has found that the misconduct was flagrant.  Next, in *Kohring* the acts of misconduct were confined to non-disclosure of evidence favorable to the accused, and the Ninth Circuit was careful to note that "'the appropriate remedy' for a *Brady/Giglio* violation will *usually* be a new trial." *Id.* at 913 (emphasis added; citation omitted).  Here, there were many forms of misconduct and in any

The unavoidably dry recital of the background and prosecution of this case set forth above does not fully account for the real impact of the Government's conduct. Dr. Lindsey and Mr. Lee were put through a severe ordeal. Charges were filed against them as a result of a sloppy, incomplete and notably over-zealous investigation, an investigation that was so flawed that the Government's lawyers tried to prevent inquiry into it. In some instances motives, statements and conduct were attributed to them that were wholly unfounded or were obtained unlawfully, such as the statements attributed to Dr. Lindsey that were suppressed because of *Miranda* violations and Agent's Guernsey's grand jury testimony that Lee "didn't want to know" what Aguilar would do with the commission payments. The financial costs of the investigation and trial were immense, but the emotional drubbing these individuals absorbed undoubtedly was even worse. As for LMC, the very survival of that small, once highly-respected enterprise has been placed in jeopardy.

That is not to say that the Lindsey Defendants are entitled to a finding of factual innocence; they are not. Moreover, the hardships described in the preceding paragraph are the plight of many defendants who go to trial. But as the *Kohring* dissent phrased it, "In this case, dismissal of the Superseding Indictment is justified not only as a deterrent but to release [defendant] from further anguish and uncertainty." 637 F.3d at 914.

*Chapman* noted that, "[a] court may exercise its supervisory power 'to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct.'" 524 F.3d at 1085 (citation omitted).[23] All of those purposes warrant dismissal here.

Within the period beginning in 2008 and continuing at least through June 27, 2011, the Government team committed many wrongful acts. It should not be permitted to escape the consequences of that conduct. By not allowing it to benefit from a "do over," the Court hopes that this ruling will have a valuable prophylactic effect.

event what may be "usual" is not what is necessarily mandated.

[23] See fn.20 above.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

    For the foregoing reasons, the convictions of the Lindsey Defendants are vacated and the First Superseding Indictment is dismissed.

    IT IS SO ORDERED.

|                           |     |     |
| ------------------------- | --- | --- |
|                           |  :  |     |
| Initials of Deputy Clerk  | SMO |     |